IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

JEFFREY PAUL EUGENE STOUT,    )
#259963,                       )
                               )
        Plaintiff,             )
                               )
v.                             )        CASE NO. 2:19-CV-494-MHT-CSC
                               )
JOHN CROW, et al.,             )
                               )
        Defendants.            )

**RECOMMENDATION OF THE MAGISTRATE JUDGE**

## I.    INTRODUCTION

Plaintiff Jeffrey Paul Eugene Stout, an inmate proceeding *pro se*, filed this 42 U.S.C.

§ 1983 action alleging violations of his Eighth and Fourteenth Amendment rights while

incarcerated at Staton Correctional Facility and Kilby Correctional Facility in 2018. Doc.

1. The Complaint names Staton Warden John Crow, Kilby Warden Jimmy Thomas, Staton

Correctional Officer Joshua Bethea, Staton Correctional Officer Deteri Mayes, and

Wexford Health Sources, Inc. ("Wexford") as defendants. *Id*. at 1, 2, 5. As relief, Plaintiff

seeks monetary damages, injunctive relief, and declaratory relief. *Id*. at 17–18.

On July 17, 2019, the Court issued an Order directing Defendants to file a Special

Report addressing Plaintiff's claims. Doc. 4. On August 13, 2019, Wexford filed a Special

Report (Doc. 23) and the individual Defendants jointly filed a separate Special Report

pertaining solely to Plaintiff's medical claims (Doc. 24). On November 22, 2019, the

individual Defendants jointly filed another Special Report pertaining to Plaintiff's non-

medical claims. Doc. 35. In their Special Reports, Defendants seek summary judgment (Docs. 23 at 15; 24 at 12; 35 at 23) and provide supporting evidentiary materials (Docs. 23-1 through 23-7; 24-1 through 24-4; 35-1 through 35-6). Thereafter, Defendants filed additional evidentiary materials. Docs. 38-1, 38-2.

On January 8, 2020, the Court directed Plaintiff to respond to Defendants' filings with affidavits or statements made under penalty of perjury and other evidentiary materials. Doc. 39. Plaintiff filed two responsive filings. Docs. 25, 44. In the January 8, 2020 Order, the Court notified the parties that "the [C]ourt may at any time [after expiration of the time for Plaintiff to file a response] and without further notice to the parties (1) treat the [S]pecial [R]eports and any supporting evidentiary materials as a motion to dismiss or motion for summary judgment, whichever is proper, and (2) after considering any response [by Plaintiff], rule on the motion in accordance with the law." Doc. 39 at 4. Pursuant to that notice, the undersigned will now construe Defendants' Special Reports as motions for summary judgment and, for the reasons set forth below, RECOMMEND that judgment be GRANTED in part and DENIED in part.

## II.   SUMMARY JUDGMENT STANDARD

Under Rule 56 of the Federal Rules of Civil Procedure, a reviewing court must grant a motion for "summary judgment if the movant shows that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a). "By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue

of *material* fact." *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 247–48 (1986). "An issue of fact is 'genuine' if the record as a whole could lead a reasonable trier of fact to find for the nonmoving party." *Redwing Carriers, Inc. v. Saraland Apartments*, 94 F.3d 1489, 1496 (11th Cir. 1996) (quoting *Anderson*, 477 U.S. at 248). "An issue is 'material' if it might affect the outcome of the case under the governing law." *Id.*

The party seeking summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56). The movant can meet this burden by presenting evidence showing there is no dispute of material fact or by showing that the nonmoving party has failed to present evidence in support of some element of his case on which he bears the ultimate burden of proof. *Id.* at 322–23.

Once the movant has satisfied this burden, the nonmoving party must "go beyond the pleadings and by [his] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Id.* at 324. In doing so, and to avoid summary judgment, the nonmovant "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The parties must support their assertions "that a fact cannot be or is genuinely disputed" by "citing to particular parts of materials in the record, including depositions, documents,

electronically stored information, affidavits or declarations, stipulations[], admissions, interrogatory answers, or other materials" or by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(A)–(B).

If the nonmovant "fails to properly address another party's assertion of fact as required by Rule 56(c)," then the Court may "consider the fact undisputed for purposes of the motion" and "grant summary judgment if the motion and supporting materials—including the facts considered undisputed—show that the movant is entitled to it." Fed. R. Civ. P. 56(e)(2)–(3).

"In reviewing whether the nonmoving party has met its burden, the [C]ourt must stop short of weighing the evidence and making credibility determinations of the truth of the matter." *Tipton v. Bergrohr GMBH-Siegen*, 965 F.2d 994, 998–99 (11th Cir. 1992) (citation omitted). "Instead, the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 999 (citations and internal quotations omitted). However, "mere conclusions and unsupported factual allegations are legally insufficient to defeat a summary judgment motion." *Ellis v. England*, 432 F.3d 1321, 1326 (11th Cir. 2005) (citation omitted). Furthermore, "[a] mere 'scintilla' of evidence supporting the opposing party's position will not suffice; there must be enough of a showing that the jury could reasonably find for that party." *Walker v. Darby*, 911 F.2d 1573, 1577 (11th Cir. 1990); *see also Anderson*, 477 U.S. at 249–50 ("If the evidence [on which the nonmoving party relies] is merely colorable, or is not significantly probative, summary judgment may be granted.") (internal citations omitted).

4

### III.   RELEVANT FACTS[1]

The following facts derive from Plaintiff's verified Complaint (Doc. 1); the sworn evidentiary materials proffered by Defendants (Docs. 23-1 through 23-7; 24-1 through 24-4; 35-1 through 35-6; 38-1; 38-2); and Plaintiff's sworn or verified affidavits in response (Docs. 25-1; 44 at 15–21). Although Plaintiff filed additional responsive materials (Docs. 25; 44 at 1–14), the Court cannot consider any statements therein in deciding summary judgment because they are neither sworn nor verified in accordance with 28 U.S.C. § 1746. *See, e.g., Roy v. Ivy*, 53 F.4th 1338, 1347 (11th Cir. 2022) ("Unsworn statements may not be considered by a district court in evaluating a motion for summary judgment.") (citing *Carr v. Tatangelo*, 338 F.3d 1259, 1273 n. 26 (11th Cir. 2003)).

First, Plaintiff's 19-page Complaint and subsequent affidavits—which are largely duplicative—set forth the following claims:

In September 2018, while incarcerated at Staton, an inmate named Cordelious Seay "had been up for 4 days straight shooting methaphedimin [sic] (ice) intravenously." Docs. 1 at 7; 25-1 at 1. An inmate in D-Dorm stabbed Seay multiple times. *Id.* Upon being escorted from D-Dorm, Seay stated that he would "be back and will stab everybody!" *Id.* Defendant Warden John Crow "was made aware of this incident and the threats Seay made." *Id.* Nevertheless, Defendant Crow "ordered Seay's return to population." *Id.* Upon

---

[1] The "facts" set forth herein are merely for purposes of resolving summary judgment and may not be the actual facts. *See Cox v. Adm'r U.S. Steel & Carnegie*, 17 F.3d 1386, 1400 (11th Cir.), *opinion modified on reh'g*, 30 F.3d 1347 (11th Cir. 1994) ("[W]hat we state as 'facts' . . . for purposes of reviewing the rulings on the summary judgment motion [] may not be the actual facts.").

returning to population, "Seay walked in D-Dorm, pulled out a knife[,] and stabbed [Plaintiff]," once in the arm and once in the right hand. *Id.*

Plaintiff yelled for help, but the unidentified officers in the dorm did not respond and instead just stood around watching. Docs. 1 at 7; 25-1 at 2. Other inmates wrestled Seay down and disarmed him, at which point the officers handcuffed Seay and escorted him out of the dorm. *Id.* As he was being escorted out of the dorm, Seay stated, "I will be back and stab all you snitches." Doc. 44 at 16. Other officers carried Plaintiff to the infirmary, where he received a body chart and stitches in his arm. Docs. 1 at 8; 25-1 at 2. An unidentified Wexford medical provider told Plaintiff that the tendon in his right hand was severed and would require surgery to repair. *Id.*; Doc. 44 at 16.

Six days after the stabbing, Defendant Crow told Plaintiff that he "should not have allowed Seay back into [his] population after being informed that Seay had been high on meth 4 days and made those loud verbal threats to stab everyone." Docs. 1 at 9; 25-1 at 2. Defendant Crow "understood the violent culture in [his] prison and that due to the overcrowding and drugs coming in, [his] officers just could not adequately keep each inmate safe." *Id.* Defendant Crow then told Plaintiff that he was going to "disapprove his and Seay's disciplinary reports and coerced [Plaintiff] to sign a living agreement with Seay." *Id.* Defendant Crow stated that he did not want any paperwork trouble, he did not want his officers facing trouble, and if Plaintiff refused to sign the living agreement, Plaintiff would "be found guilty on [his] disciplinary, [his] custody would be closed, and [he] would be sent to a more violent prison than Staton." Doc. 44 at 17. He further stated, "You two are going back to population and better not hear of no further incidents or you're

6

going to lock up." Docs. 1 at 9; 25-1 at 3. Despite Plaintiff's pleas to the contrary, Plaintiff and Seay "were placed right back in population in the same dorm." *Id*. Plaintiff made "repeated request[s]" for a bed change to Captain Howard, Captain Holstick, Lieutenant Hines, and several other officers, including Defendant Officer Bethea, "to no avail." Docs. 1 at 10, 11; 25-1 at 3.

Ten to fourteen days after the stabbing, Plaintiff was taken to Jackson Medical Center for surgery to repair his hand. Docs. 1 at 10; 25-1 at 3. The "MD/surgeon" informed Plaintiff that "because it took so long for ADOC to bring him[,] his tendons . . . contracted and . . . he may not be able to fully repair [Plaintiff's] hand." Doc. 1 at 10. Following the surgery, Plaintiff was prescribed pain medication for the first time and his hand was placed in a cast. Docs. 1 at 10; 25-1 at 3. Once Plaintiff returned to Staton, "Wexford discontinued all pain medication" other than Motrin, which was not effective. *Id*.; Doc. 44 at 17. Despite the surgery, Plaintiff remains "totally disabled in his right hand." Doc. 1 at 10.

On October 11, 2018, Defendant Bethea told Plaintiff he would "kick [his] ass" and "put the rest of his body in a cast" if he requested another bed change. Docs. 1 at 11; 25-1 at 3. A few hours later, Seay approached Plaintiff and told him "he [would] stab [Plaintiff] again and kill him . . . if [Plaintiff] didn't pay him an unspecified sum of money." *Id*. Moments later, Defendant Officer Mayes called pill call, but Defendant Bethea did not allow Plaintiff and several other inmates to go to pill call. *Id*. Plaintiff told Defendants Mayes and Bethea about Seay's threat and again asked to be moved out of the dorm, at which point Bethea punched Plaintiff and screamed, "I told you I was gone [sic] kick your

ass if you asked to be moved again." Docs. 1 at 11-12; 25-1 at 3–4. Defendant Mayes stated, "Man you wiggin[,] go lay down." Docs. 25-1 at 4; 44 at 18.

Plaintiff "took off running" from Defendant Bethea "and was tackled to the ground." Docs. 1 at 12; 25-1 at 4. Defendants Mayes and Bethea "began punching and kicking" Plaintiff, despite Plaintiff begging them to stop, "as Plaintiff was balled up in fetal position on the ground." *Id*. A "large crowd of inmates rushed out [of] the dorm and rushed the officers." *Id*. Defendant Bethea placed Plaintiff in a chokehold until other inmates pried his arms loose. Doc. 1 at 12. Approximately 15 seconds later, Lieutenant Totty, Sergeant Davis, and other officers arrived and immediately escorted Plaintiff to the infirmary. *Id*.; 25-1 at 4. Plaintiff was not sprayed or placed in handcuffs. Doc. 1 at 12. Defendants Mayes and Bethea were bleeding from cuts received by other inmates. *Id*. Thereafter, "I and I" came to visit Plaintiff and Plaintiff's "cast was cut off." *Id*. After cutting Plaintiff's cast, "I and I" refused to take Plaintiff to the hospital "to have his hand positioned back in its specific position the hand surgeon had it in . . . and the cast replaced." *Id*. Plaintiff was then transferred to Kilby and placed in segregation under investigation. *Id*.

On October 16, 2018, Lieutenant Sewell came to Kilby from Staton to hold Plaintiff's disciplinary hearing "although [Plaintiff] never rec[ei]ved no disciplinary report of such." *Id*. at 13. Lieutenant Sewell found Plaintiff guilty and "recommended sanctions of 45 days segregation, 60 days no outside, and reclass" among other sanctions. *Id*. Lieutenant Sewell told Plaintiff that Defendant Crow told him to find Plaintiff guilty, and he was just following orders. *Id*. Lieutenant Sewell did not call any witnesses. *Id*. On October 17, 2018, Defendant Warden Thomas "approved the disciplinary and

recommended sanctions against [Plaintiff] even though it was unequivocal [Plaintiff] was not given a fair hearing." *Id*. On October 18, 2018, Plaintiff sent a request to Defendant Thomas regarding the sanctions and not receiving a proper hearing, but Defendant Thomas never responded. *Id*. On or around October 25, 2018, Plaintiff again "brought the situation to [Defendant Thomas'] attention," and he responded, "This is prison. You're an inmate. Get used to it!" Docs. 1 at 14; 25-1 at 4–5.

On November 9, 2018, Plaintiff was transferred to Limestone Correctional Facility, where he remained in segregation and on outside restriction. Doc. 1 at 14. On November 27, 2018, a reclassification hearing was held for Plaintiff. *Id*.; 25-1 at 5. Plaintiff called multiple witnesses in his defense, including Defendant Bethea, Correctional Officer Carter, inmates Combs and Belser, and Nurse Bailey, who stated that Plaintiff was not the inmate who stabbed Defendants Mayes and Bethea. *Id*. Nevertheless, Plaintiff remained in segregation for more than 270 days. *Id*. at 15.

In response, Defendants proffer evidence of the following version of events:

### a.    **Medical Evidence**

On September 13, 2018, Plaintiff was brought to the Health Care Unit at Staton, where a body chart was performed by the nurse on duty. Doc. 23-1 at 3. Plaintiff informed the nurse that he had been stabbed, and the nurse noted a stab wound on Plaintiff's left upper arm. *Id*.; Doc. 23-2 at 1. At 2:25 p.m., Plaintiff was seen by a medical provider who noted that Plaintiff had a laceration on his right hand as well as his left arm. Doc. 23-1 at 3. The medical provider recommended that an appointment be scheduled for Plaintiff to see an outside orthopedic specialist. *Id*.

On September 17, 2018, Plaintiff was seen by an outside orthopedic specialist at Alabama Orthopedics. *Id*. The specialist recommended that Plaintiff's right small finger needed flexor tendon repair "ASAP." *Id*. at 3–4; Doc. 23-2 at 8. On October 3, 2018, Plaintiff was taken to Jackson Hospital, where he was treated for a "right zone 2 flexor tendon injury." Docs. 23-1 at 4; 23-2 at 13. A "right small finger flexor tendon repair, FDP zone 2, with excision of ulnar FDS tendon strand" was performed by the orthopedic specialist. *Id*. The specialist noted in his surgery notes, "The injury was already about 2-1/2 weeks out, which was not ideal but could be enough[.]" Doc. 23-2 at 13.

On October 11, 2018, Plaintiff was again brought to the Health Care Unit at Staton. Doc. 23-1 at 4. Plaintiff did not make a statement to the nurse, who noted that Plaintiff was "alert and oriented times 3" and had an abrasion on his elbow and right side. *Id*.; Doc. 23-3 at 12. That same day, Plaintiff was transferred from Staton to Kilby. Docs. 23-1 at 4; 23-3 at 14. The intake nurse at Kilby noted that Plaintiff was "alert and oriented times 3," his respirations were at ease, and he was not in distress. *Id*.

On October 16, 2018, the nurse practitioner at Kilby evaluated the wound on Plaintiff's finger. Doc. 23-1 at 4. The nurse practitioner evaluated the wound and the status of the laceration repair and removed and reapplied the dressing. *Id*. at 5. On October 19, 2018, Plaintiff returned to see his surgeon, who recommended that Plaintiff be provided with a removable splint and that he perform therapy on his own daily. *Id*.; Doc. 23-4 at 4–5.

On October 29, 2018, Plaintiff was again seen in the Health Care Unit. The nurse noted:

> Inmate put in sick call on 10/23 and 10/27 in reference to not receiving therapy and proper treatment to right hand. Review of the chart revealed inmate did have surgery on the hand; however, the order is for therapy on his own times 30 days and follow up visit thereafter. No orders were written for treatment. Inmate educated on information as well as exercises to perform to obtain better range-of-motion. The inmate verbalized thanks and understanding as he believed that he would have one-on-one therapy. No further issues at this time.

Docs. 23-1 at 5; 23-4 at 10. On November 9, 2018, Plaintiff was transferred from Kilby to Limestone, at which time he received another body chart. Docs. 23-1 at 6; 23-4 at 13. The nurse noted that Plaintiff had a right-hand injury and had previously had surgery on October 18. Doc. 23-1 at 6. Plaintiff's right hand was wrapped, he was alert and oriented, his gait was steady, and he was in stable condition. *Id.*; Doc. 23-4 at 18. Plaintiff was seen regularly by the medical staff at Limestone upon his arrival. Doc. 23-1 at 6.

On March 21, 2019, Plaintiff was seen by another orthopedic specialist. *Id.* The specialist noted that Plaintiff had a "right small finger FDP tendon repair" in August 2018 with no subsequent therapy. *Id.*; Doc. 23-6 at 9. Plaintiff presented to the specialist with "RSF stiffness and contracture." *Id.* The specialist noted that Plaintiff had "70 degree flexion contracture at PIP, DIP joints with intact tendon repair." The specialist recommended aggressive stretching with passive extension exercises to improve flexion extension before considering tenolysis. *Id.*

Defendants Crowe, Thomas, Bethea, and Mayes each aver that at no time have they ever provided any healthcare to Plaintiff; been involved in any decisions related to the healthcare of Plaintiff; had any conversations with medical providers regarding medical care or treatment for Plaintiff; or had any conversations with medical providers regarding

prescriptions for Plaintiff. Docs. 24-1 through 24-4. Rather, "[a]ll medical decisions related to necessary medical health care were made at all relevant times by employees and/or medical providers employed by Wexford." *Id.*

   **b.   Non-Medical Evidence**

On September 13, 2018, at approximately 12:30 p.m., Officer James Golson observed Plaintiff and inmate Cordarius Evans[2] "running from Bay #3 into the Dayroom." Doc. 35-1 at 2, 3. Both inmates had weapons[3] and were swinging at each other. *Id.* Officer Golson called code "Blue," and Sergeant Jones and Officers Alfred Murphy, Terrence Rabb, and Dante Baldwin reported to D-Dorm dayroom. *Id.* Both inmates were handcuffed and escorted to the Health Care Unit, where they received a medical evaluation. *Id.* Evans suffered a stab wound to his back, and Plaintiff suffered a stab wound to his left arm. *Id.* at 2–5. Both inmates were placed in segregation following the incident. *Id.* at 2, 3.

When questioned, Plaintiff claimed that Evans approached him and started "arguing over petty stuff and it built up from that." *Id.* Evans claimed that Plaintiff "always had other inmate[s] in their area and [he] just got tired of it" and that they both stabbed each other with weapons. *Id.* At approximately 1:40 p.m., Sergeant Jones called I & I Investigator Dave Galley and informed him of the incident. *Id.* at 3. Sergeant Jones verbally reprimanded both inmates and informed them that disciplinary action would be initiated

---

[2] Defendants state that there is no evidence to support Plaintiff's allegations involving inmate Cordelious Seay. Doc. 35 at 6. There are no incident reports or other documentation indicating that Seay stabbed an inmate and was removed from the dorm or that he threatened to stab everyone in the dorm when he returned. *Id.*

[3] Sergeant Jones retrieved an eight-inch metal scissor and six-inch metal scissor wrapped in plastic from the floor near the entrance in Bay #3. Doc. 35-1 at 3.

for fighting with a weapon. *Id*. On September 19, 2018, both inmates signed a Living Agreement and were released back into population. *Id*.

On October 11, 2018, Defendant Bethea was assigned as the Dormitory C Rover, and Defendant Mayes was assigned as the Dormitory D Rover. Doc. 35-1 at 14. At approximately 5:10 a.m., Plaintiff exited Dormitory D attempting to go to pill call. *Id*. Defendant Bethea, who was monitoring the C and D Corridor, ordered Plaintiff to return to Dormitory D. *Id*. Plaintiff refused the order, grasped Defendant Bethea's shirt, and stated, "We got knives and sticks and we know how to use them." *Id*. Defendant Bethea attempted an unsuccessful two-on-one takedown, and Plaintiff retrieved a razor from his cast and cut Defendant Bethea in the face next to his right eye, under his chin, and on his left wrist. *Id*. Defendant Mayes immediately called for assistance via radio as he attempted to restrain Plaintiff. *Id*. A crowd of inmates circled around Defendants, and Plaintiff proceeded to cut Defendant Mayes in the face and left forearm. *Id*. Lieutenant Justin Totty and Sergeant Murphy Davis responded, placing Plaintiff in handcuffs and ordering the other inmates to report to their assigned beds. *Id*.

Lieutenant Totty escorted Defendants to the Health Care Unit, where they received a medical evaluation. *Id*. The nurse advised Lieutenant Totty that Defendants would need to be transported to Jackson Hospital for further medical evaluation. *Id*. At approximately 5:25 a.m., Defendants left Staton for Jackson Hospital. *Id*. At approximately 5:27 a.m., Lieutenant Totty escorted Plaintiff to the Health Care Unit, where he received a medical evaluation. *Id*. Lieutenant Totty conducted a pat search of Plaintiff, including his cast, and no contraband was found. *Id*. Plaintiff was placed in the Hallway Holding Cell pending

disciplinary action for "rule violation Assault with a weapon on an ADOC Official." *Id*. Lieutenant Totty questioned Plaintiff concerning the incident, and Plaintiff claimed that inmate Deontae Combs stabbed Defendants with an unknown object that appeared to be a knife. *Id*. When questioned about that allegation, Combs "admitted to observing [Plaintiff] removing a razor from his cast [and] then slicing [Defendants] multiple times in the facial area and arms." *Id*. at 14–15. Combs was placed in the Staton Healthcare Holding Cell pending investigation. *Id*. at 15.

At approximately 10:18 a.m., Defendants Mayes and Bethea returned to Staton. *Id*. Defendant Mayes obtained a fractured right hand and multiple lacerations requiring a total of 18 stitches. *Id*. Defendant Bethea obtained multiple lacerations requiring medical adhesive and eight stitches. *Id*. Thereafter, Plaintiff was reassigned to Kilby. *Id*.

Plaintiff's Disciplinary Report from the October 11, 2018 incident provides that Plaintiff was charged by Lieutenant Totty with a violation of Rule 903—Assault with a weapon on a Person(s) associated with ADOC for cutting Defendants Mayes and Bethea with a razor. *Id*. at 24, 25. Marcus Duncan certified that he personally served a copy of the Report on Plaintiff on October 11, 2018 at 11:47 and informed him of his rights to present a statement at the hearing and written questions for witnesses. *Id*. The Report reflects that Plaintiff refused to sign or indicate if he desired witnesses. *Id*.

Plaintiff's hearing was held on October 16, 2018 at 12:30 in the Kilby Seg Commander's Office. *Id*. at 25. The Hearing Officer was Jarmal Sewell. *Id*. Officer Sewell made the following findings:

> After further investigation, it was discovered that [Plaintiff] cut [Defendants Mayes and Bethea] with a razor. The Hearing Officer questioned [Defendants] concerning the incident. [Defendant Mayes] positively identified [Plaintiff] as the inmate who assaulted him. Lt. Sewell questioned inmate Combs, who also identified [Plaintiff] as the inmate who cut [Defendants].

*Id*. at 26. Accordingly, Officer Sewell found Plaintiff guilty and recommended the following sanctions: extra duty for 45 days at two hours per day; loss of outside privileges, canteen privileges, telephone privileges, and visiting privileges for 60 days; disciplinary segregation for 45 days; and custody review. *Id*. Officer Sewell further affirmed that Plaintiff was given written notice of his charges at least 24 hours prior to the hearing, able to attend the hearing, permitted to call at least three witnesses, and permitted to prepare questions for the witnesses. *Id*. at 27.

On November 27, 2018, after notice and a hearing at which Plaintiff was permitted to present a statement and questions to witnesses, a "level V, Close custody" was recommended for Plaintiff due to the serious injuries sustained by Defendants Mayes and Bethea. *Id*. at 29–38. In response to Plaintiff's questions, witness Defendant Bethea indicated that he saw Plaintiff with a weapon and Plaintiff assaulted him and Defendant Mayes with a weapon. *Id*. at 35. However, he further indicated that, in the Nurse's Station after the incident, he initially stated that Plaintiff was not the inmate who assaulted him. *Id*. Witness Correctional Officer Carter indicated that he was in the Nurse's Station after the incident and heard Defendants state that Plaintiff was not the inmate who assaulted them. *Id*. at 37. Witness inmate Combs indicated that he "could not tell" if Plaintiff had a

weapon, but he was pressured or coerced to give a statement against Plaintiff concerning the incident. *Id*. at 36.

Defendant Crow avers that he had no knowledge that inmate Seay made any threats to stab Plaintiff or anyone else; he made no orders for inmate Seay to return to population; he never communicated with Plaintiff regarding allowing inmate Seay back in population; he did not coerce Plaintiff into signing a living agreement; and he did not advise Lieutenant Sewell to find Plaintiff guilty on any disciplinary. Doc. 35-2.

Defendant Thomas avers that Plaintiff was in fact moved to Kilby pending disciplinary action and an investigation; Plaintiff's disciplinary hearing was held and sent to Defendant Thomas for review and approval; Defendant Thomas reviewed Plaintiff's disciplinary to ensure no due process violations had occurred; and he neither received a request from Plaintiff regarding the disciplinary nor told him, "This is prison. You are an inmate. Get used to it." Doc. 35-3.

Defendant Bethea avers that Plaintiff never made complaints to him about fearing for his life and that he never punched or kicked Plaintiff in response to such complaints. Doc. 35-4. When Plaintiff left D-Dorm to go to pill call, Plaintiff was advised that pill call was over and instructed to go back inside the dorm. *Id*. However, Plaintiff refused the order and grabbed Defendant Bethea's shirt, stating, "We have sticks and knives and we know how to use them." *Id*. Defendant Bethea attempted a two on one takedown of Plaintiff that was unsuccessful, and Plaintiff pulled a razor out of his cast and cut Defendant Bethea in the face, chin, and left forearm. *Id*. Neither Defendant Bethea nor Defendant Mayes told Lieutenant Totty that Plaintiff did not cut them. *Id*.

16

Defendant Mayes avers that Plaintiff did not tell him inmate Seay was going to stab him or that he feared for his life and did not ask him to move dorms because he feared for his safety. Doc. 35-5. Defendant Mayes did not punch or kick Plaintiff. *Id*. On October 11, 2019, Plaintiff and Bethea got into a physical exchange and Defendant Mayes immediately called for assistance. *Id*. Defendant Mayes tried to restrain Plaintiff, and he was cut with a razor on the right side of his face and left arm. *Id*. Neither Defendant Mayes nor Defendant Bethea told Lieutenant Totty that Plaintiff did not cut them. *Id*.

Finally, Officer Sewell avers that he found Plaintiff guilty during his disciplinary hearing based on the written statement of inmate Combs and the verbal statement of Lieutenant Totty, both of which advised that Plaintiff assaulted Defendants Mayes and Bethea. Doc. 35-6. Lieutenant Totty conducted the investigation and attended the hearing telephonically, and Plaintiff did not ask for any witnesses during the hearing. *Id*.

## IV.   DISCUSSION

In his Complaint, Plaintiff alleges violations of his Eighth and Fourteenth Amendment rights. Doc. 1 at 16. In his subsequent verified affidavit, Plaintiff specifies that he purports to state the following claims against the following Defendants: (1) an Eighth Amendment failure to protect claim against Defendant Crow for failing to prevent another inmate from stabbing Plaintiff; (2) an Eighth Amendment delay of medical care claim against Wexford for not scheduling Plaintiff's tendon surgery earlier and only prescribing him Motrin; (3) an Eighth Amendment excessive force claim against Defendants Mayes and Bethea for the October 11, 2018 incident; and (4) an Eighth Amendment conditions of confinement claim against Defendant Thomas for depriving Plaintiff of outside privileges

for 60 days. *See* Doc. 25-1 at 5–6. The Court further liberally construes Plaintiff's *pro se* pleadings as attempting to assert a Fourteenth Amendment deprivation of due process claim against Defendants Crow and Thomas regarding his October 16, 2018 disciplinary hearing.[4]

### a. Plaintiff has established a genuine issue of material fact as to an Eighth Amendment failure to protect claim against Defendant Crow.

The Eighth Amendment imposes a duty upon prison officials to "take reasonable measures to guarantee the safety of the inmates" in their custody. *Farmer v. Brennan*, 511 U.S. 825, 832–33 (1994) (citations omitted). However, it is well-established that not every injury suffered by an inmate at the hands of another "translates into constitutional liability for prison officials responsible for [the inmate's] safety." *Id.* at 834; *see also Zatler v. Wainwright*, 802 F.2d 397, 400 (11th Cir. 1986). To state a viable claim under the Eighth Amendment, "there must be at least some allegation of a conscious or callous indifference to a prisoner's rights, thus raising the tort to constitutional stature.'" *Williams v. Bennett*, 689 F.2d 1370, 1380 (11th Cir. 1982) (*quoting Wright v. El Paso Cnty. Jail*, 642 F.2d 134, 136 (5th Cir. 1981)).

A constitutional violation occurs only if a prison official is deliberately indifferent to a known risk of objectively, sufficiently serious harm to an inmate. *Farmer*, 511 U.S. at 834 (quoting *Wilson v. Seiter*, 501 U.S. 294, 298 (1991)); *see also Brown v. Hughes*, 894

---

[4] To the extent Plaintiff's allegations can be construed as attempting to state an Eighth Amendment failure to intervene claim based on the response of prison officials when Plaintiff was stabbed, Plaintiff has wholly failed to identify those officials, and there are no allegations or evidence suggesting that any of the named Defendants in this lawsuit were present for or involved in the incident. Accordingly, any such claim must fail.

F.2d 1533, 1537 (11th Cir. 1990) ("When officials become aware of a threat to an inmate's health and safety, the [E]ighth [A]mendment's proscription against cruel and unusual punishment imposes a duty to provide reasonable protection."). A risk is "known" only if the prison official is both "aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, *and* he . . . also draw[s] th[at] inference." *Farmer*, 511 U.S. at 837 (emphasis added). "[A]n official's failure to alleviate a significant risk that he should have perceived but did not" is insufficient to establish liability. *Id*. at 838. Moreover, the risk of harm to the inmate must be a "strong likelihood, rather than a mere possibility." *Edwards v. Gilbert*, 867 F.2d 1271, 1276 (11th Cir. 1989) (citation omitted).

When viewed in a light most favorable to Plaintiff, the undersigned finds that there is sufficient evidence in the record upon which a jury could find that Defendant Crow failed to protect Plaintiff in violation of the Eighth Amendment. Indeed, Plaintiff avers that inmate Seay/Evans "had been up for 4 days straight shooting methaphedimin [sic] (ice) intravenously"; Seay/Evans specifically stated that he would return to D-Dorm and "stab everybody"; Defendant Crow "was made aware of this incident and the threats [Seay/Evans] made"; Defendant Crow nevertheless "ordered [Seay/Evans to] return to population"; and, upon returning to population, Seay/Evans "walked in D-Dorm, pulled out a knife[,] and stabbed [Plaintiff]" twice. He further avers that, six days after the stabbing, Defendant Crow told Plaintiff that he "should not have allowed [Seay/Evans] back into [his] population after being informed that [he] had been high on meth 4 days and made those verbal threats to stab everyone" but again placed Plaintiff and Seay/Evans "right back in population in the same dorm."

These allegations, taken as true, support a reasonable inference that Defendant Crow was deliberately indifferent to a known risk of objectively, sufficiently serious harm to Plaintiff. First, an inmate exhibiting a "visibly violent, mentally unstable state . . . pose[s] an objective risk of serious harm to other inmates." *Cottone v. Jenne*, 326 F.3d 1352, 1358 (11th Cir. 2003). Second, the record supports a finding that Defendant Crow was subjectively aware of the substantial risk of serious harm Seay/Evans posed to Plaintiff, as Plaintiff avers that he specifically told Defendant Crow about Seay/Evans' condition and threats; that Defendant Crow ordered Seay/Evans to return to D-Dorm despite that information; that Defendant Crow later acknowledged that he should not have returned Seay/Evans to D-Dorm after receiving such information, but he did not want any paperwork trouble; and that Defendant Crow again sent Plaintiff and Seay/Evans back to the same dorm despite Plaintiff's pleas to the contrary.

Although Defendants dispute Plaintiff's allegations and present evidence casting doubt on Plaintiff's version of events, the Court must take Plaintiff's evidence as true at the summary judgment stage. *See Tipton*, 965 F.2d at 999; *see also Sears v. Roberts*, 922 F.3d 1199, 1208 (11th Cir. 2019) (finding that the parties' dueling stories about the underlying incident presented "a classic swearing match, which is the stuff of which jury trials are made"). Viewed in that light, the evidence supports a finding that Defendant Crow failed to take reasonable measures to protect Plaintiff despite a known risk of objectively, sufficiently serious harm to him. *See Farmer*, 511 U.S. at 834; *Brown*, 894 F.2d at 1537.

Accordingly, Defendant Crow is not entitled to summary judgment on Plaintiff's Eighth Amendment failure to protect claim.[5]

     **b.**    **Plaintiff has failed to establish a genuine issue of material fact as to an Eighth Amendment delay of medical care claim against Wexford.**

"A private entity, like Wexford, that contracts to provide medical services to inmates performs traditional state functions and, therefore, is treated as a municipality for purposes of § 1983 claims." *Roy*, 53 F.4th at 1347 (citing *Craig v. Floyd Cnty.*, 643 F.3d 1306, 1310 (11th Cir. 2011)). A municipality may be held liable under § 1983 if its policy or custom causes the plaintiff's injury. *Id.* (citing *Swain v. Junior*, 958 F.3d 1081, 1091 (11th Cir. 2020)). "In the absence of an official policy endorsing a constitutional violation, a plaintiff must show: (1) that the municipality had a custom or practice of permitting such

---

[5] Upon consideration of the totality of the evidence, the undersigned finds that Defendant Crow is not entitled to qualified immunity on this claim. Prior to the conduct in this case, the Eleventh Circuit had already made clear that:

> [A] prison [official] violates a prisoner's Eighth Amendment right when that [official] actually (objectively and subjectively) knows that one prisoner poses a substantial risk of serious harm to another, yet fails to take any action to investigate, mitigate, or monitor that substantial risk of serious harm.[] This Court, in *Cottone*, held that the total failure to monitor or supervise a visibly violent, mentally unstable [inmate] who posed a substantial risk of serious harm to other inmates in that housing unit constituted deliberate indifference.[] When viewed in plaintiff['s] favor, the facts show that, shortly after [plaintiff's assailant threatened plaintiff's safety], the defendants simply locked [plaintiff] back in the cell with [his assailant] and walked away.[] Thus, the defendants are not entitled to qualified immunity at this summary judgment stage.

*Caldwell v. Warden, FCI Talladega*, 748 F.3d 1090, 1102–03 (11th Cir. 2014). Similarly, when viewed in Plaintiff's favor, this record indicates that, shortly after Seay/Evans threatened to stab Plaintiff and other inmates in D-Dorm, Defendant Crow returned Seay/Evans to D-Dorm without searching for a weapon and, after Seay/Evans then stabbed Plaintiff, Defendant Crow *again* returned Seay/Evans to the same dorm and took no steps to mitigate or monitor Plaintiff's substantial risk of serious harm. Thus, the undersigned finds that "the state of the law gave [Defendant Crow] fair warning that [his] alleged conduct was unconstitutional." *See Caldwell*, 748 F.3d at 1102 (citing *Cottone*, 326 F.3d at 1359).

a violation; and (2) that this custom or practice was the 'moving force' behind the violation." *Id.* (citing *Craig*, 643 F.3d at 1310).

Plaintiff has wholly failed to identify either an official policy or an unofficial custom or practice of Wexford that violated his constitutional rights. Plaintiff alleges that Wexford delayed taking him to the hospital for tendon surgery in his hand and only prescribed him Motrin for his pain, which was not effective. Doc. 1 at 8–10. However, Plaintiff has not provided any allegations or evidence whatsoever of an official policy or unofficial custom or practice that resulted in these actions. Moreover, the various actions of unidentified Wexford employees pertaining to Plaintiff's medical treatment in this case are insufficient to establish a policy or custom. *See Craig*, 643 F.3d at 1312 (explaining that a plaintiff cannot rely on "his experience alone to prove a policy or custom"); *Roy*, 53 F.4th at 1347 ("Proof of a single incident of an unconstitutional activity is insufficient to show a custom, which must be such 'a longstanding and widespread practice that it is deemed authorized by the policymaking officials because they must have known about it but failed to stop it.'").[6] Accordingly, Wexford is entitled to summary judgment on Plaintiff's Eighth Amendment delay of medical care claim.[7]

---

[6] *See also Jackson v. Corizon Health, Inc.*, No. 20-14737, 2022 WL 303288, at *6 (11th Cir. Feb. 2, 2022) (internal quotations and citations omitted):

> Even assuming that [a Corizon employee's] statements could establish a custom or policy attributable to Corizon, [plaintiff's] claim that this alleged custom or policy resulted in a constitutionally inadequate delay in medical care that caused him injury rests only on his experience, which is, at most, proof of a single incident of unconstitutional activity.[] The standard for holding a municipality liable under § 1983 is high, and proof of a single incident is not sufficient to impose liability.

[7] To the extent Plaintiff's allegations can be construed as attempting to state an Eighth Amendment delay of medical care claim against Defendants Crow, Thomas, Mayes, or Bethea, the undersigned finds these

     **c.**     **Plaintiff has established a genuine issue of material fact as to an Eighth Amendment excessive force claim against Defendants Mayes and Bethea.**

To succeed on an Eighth Amendment excessive force claim, Plaintiff must demonstrate that force was applied "maliciously and sadistically for the very purpose of causing harm" rather than "in a good faith effort to maintain or restore discipline." *Whitley v. Albers*, 475 U.S. 312, 320–21 (1986) (citation omitted); *see also Hudson v. McMillian*, 503 U.S. 1, 8 (1992). To determine if an application of force was applied maliciously and sadistically to cause harm, the Court considers the following five factors:

> (1) the extent of the injury, (2) the need for application of force, (3) the extent of the threat to the safety of staff and inmates, as reasonably perceived by the responsible officials on the basis of facts known to them, (4) the relationship between the need and the amount of force used, and (5) any efforts made to temper the severity of a forceful response.

*Hall v. Santa Rosa Corr. Inst.*, 403 F. App'x 479, 481 (11th Cir. 2010) (citing *Campbell v. Sikes*, 169 F.3d 1353, 1375 (11th Cir. 1999)). Under this analysis, summary judgment will be denied "if the evidence viewed in the light most favorable to [Plaintiff] goes beyond a mere dispute over the reasonableness of the force used and will support a reliable inference of wantonness in the infliction of pain." *Brown v. Smith*, 813 F.2d 1187 (11th Cir. 1987).

Accepting Plaintiff's version of events as true, as the Court must at this stage, Defendant Bethea told Plaintiff he would "kick [his] ass" and "put the rest of his body in a cast" if he requested another bed change; later that day, Plaintiff again requested a bed change, at which point Bethea punched Plaintiff and screamed, "I told you I was gone [sic]

---

Defendants are entitled to summary judgment on any such claim. Indeed, it is undisputed that Defendants were not involved in any decisions pertaining to Plaintiff's healthcare and that, instead, Wexford medical providers were responsible for such decisions. *See* Docs. 24-1 through 24-4.

kick your ass if you asked to be moved again"; Plaintiff "took off running" from Defendant Bethea "and was tackled to the ground"; and Defendants Mayes and Bethea "began punching and kicking" Plaintiff while Plaintiff laid on the floor in the fetal position and begged them to stop. Defendant Bethea then placed Plaintiff in a chokehold until other inmates—who rushed out of the dorm and rushed the officers—pried his arms loose. Approximately 15 seconds later, the incident ended when other officers arrived and immediately escorted Plaintiff to the infirmary. Plaintiff suffered an abrasion on his elbow and right side, and Defendants Mayes and Bethea suffered cuts received by other inmates.

Upon consideration of these facts and the above five factors, the undersigned finds that there is sufficient evidence in the record upon which a jury could find that Defendants Mayes and Bethea applied force maliciously and sadistically to cause harm. Defendants argue that "there is no indication whatsoever that [Plaintiff] sustained anything more than de minimis injuries" (Doc. 35 at 12), and the undersigned agrees that the first factor—the extent of Plaintiff's injury—weighs in Defendants' favor; Plaintiff appears to have suffered only two mild abrasions that required no medical treatment. However, it is well-settled that "the extent of the injury inflicted upon the prisoner is but one factor to consider in an excessive force claim," *Sears*, 922 F.3d at 1209 n.4, and "courts cannot find excessive force claims not actionable [simply] because the prisoner did not suffer more than *de minimis* injury," *Sconiers v. Lockhart*, 946 F.3d 1256, 1267 (11th Cir. 2020) (internal quotations and citation omitted); *see also Wilkins v. Gaddy*, 559 U.S. 34, 38–39 (2010). Rather, "[a]n officer's single punch to a prisoner who does not pose a danger can constitute excessive

force." *Wright v. Grant*, No. 1:20-CV-96, 2021 WL 3934248, at *7 (N.D. Fla. July 7, 2021) (citations omitted).

Notably, all four remaining factors weigh in favor of Plaintiff. As to the second factor, accepting Plaintiff's version of events as true, there was no need whatsoever for application of force. Indeed, according to Plaintiff, the force was not applied because Plaintiff refused to comply with an order regarding pill call; instead, Bethea punched Plaintiff and told him he was going to "kick [his] ass" simply because Plaintiff requested another bed change. Then, Defendants Mayes and Bethea began punching and kicking Plaintiff while he laid on the ground in the fetal position, begging them to stop.[8]

As to the third factor, Plaintiff did not pose a reasonable threat to Defendants when Defendant Bethea first punched him and they both began punching and kicking him. Although Plaintiff ran away from Defendants, he only did so after Defendant Bethea punched him and told him he was going to "kick [his] ass" and "put the rest of his body in a cast." Additionally, although "a large crowd" of inmates subsequently rushed the officers—which may certainly constitute a reasonable threat—that again occurred <u>after</u> the initial use of force by both Defendants.

---

[8] Plaintiff's allegation that Defendant Bethea threatened him with violence supports a reasonable inference that his subsequent use of force was malicious and sadistic, rather than a good-faith effort to maintain or restore discipline. Moreover, Plaintiff's allegation that he was on the ground in the fetal position begging Defendants to stop punching and kicking him supports a reasonable inference that Plaintiff was "not posing a threat to officers or others, and not actively resisting [restraint]." *Cf. Joseph on behalf of Est. of Joseph v. Bartlett*, 981 F.3d 319, 342 (5th Cir. 2020).

As to the fourth factor, because the undersigned finds that there was no need for application of force at the outset, Defendants' punching and kicking of Plaintiff—regardless of the amount—was unreasonable.

Finally, as to the fifth factor, Defendants' efforts to temper the severity of a forceful response—to the extent there were any—were lacking. Indeed, according to Plaintiff, Defendant Bethea punched him simply for requesting another bed change; Defendants Mayes and Bethea tackled him to the ground rather than verbally commanding him to stop running; and Defendants Mayes and Bethea punched and kicked him while he laid on the ground in the fetal position. Although Plaintiff was immediately escorted to the infirmary following the altercation, *see, e.g., Natty v. Walrath*, No. 7:11-CV-27, 2012 WL 2573434, at *6 (M.D. Ga. June 12, 2012) ("Defendants attempted to temper the severity of a forceful response by . . . providing Plaintiff with medical treatment following the use of force."), he was escorted there by officers other than Defendants.

Once again, Defendants sharply dispute Plaintiff's version of events, providing opposing evidence that Plaintiff refused to comply with a direct order; grasped Defendant Bethea's shirt and threatened him; and cut Defendants with a razor when they attempted to restrain him. However, once again, when presented with these wholly conflicting accounts, the Court must accept Plaintiff's evidence as true and draw all reasonable inferences in his favor. *See Tipton*, 965 F.2d at 999; *Sears*, 922 F.3d at 1208. Accordingly, Defendants

Mayes and Bethea are not entitled to summary judgment on Plaintiff's Eighth Amendment excessive force claim.[9]

> **d.**    **Plaintiff has failed to establish a genuine issue of material fact as to a Fourteenth Amendment deprivation of due process claim against Defendants Crow and Thomas.**

To succeed on a due process claim, Plaintiff must first demonstrate the deprivation of a protected liberty or property interest. *Mathews v. Eldridge*, 424 U.S. 319, 332 (1976); *Morrissey v. Brewer*, 408 U.S. 471, 481 (1972). As a result of his disciplinary hearing, Plaintiff received extra duty for 45 days at two hours per day; loss of outside privileges, canteen privileges, telephone privileges, and visiting privileges for 60 days; disciplinary segregation for 45 days; and custody review. While the majority of these sanctions do not constitute protected liberty interests, the Eleventh Circuit has determined that "deprivation of yard time imposes enough of a hardship to qualify as a constitutionally protected liberty interest." *Bass v. Perrin*, 170 F.3d 1312, 1318 (11th Cir. 1999).

Thus, because Plaintiff has demonstrated deprivation of a protected liberty interest, the Court must next consider "whether [Plaintiff] [was] afforded due process in conjunction with the deprivation of that interest." *See id*. "The minimum requirements of due process for prisoners facing disciplinary action . . . are (1) advance written notice of the charges; (2) a written statement of the reasons for the disciplinary action taken; and (3) the

---

[9] Upon consideration, the undersigned finds that Defendants are not entitled to qualified immunity on this claim. Generally, in the Eleventh Circuit, "a defense of qualified immunity is not available in cases alleging excessive force in violation of the Eighth Amendment, because the use of force 'maliciously and sadistically to cause harm' is clearly established to be a violation of the Constitution[.]" *Skrtich v. Thornton*, 280 F.3d 1295, 1301 (11th Cir. 2002) (citation omitted), *overruled on other grounds by Pearson v. Callahan*, 555 U.S. 223 (2009). "By 1998, [Eleventh Circuit] precedent clearly established that government officials may not use gratuitous force against a prisoner who has been already subdued[.]" *Id*. at 1303 (citations omitted).

opportunity to call witnesses and present evidence, when consistent with institutional safety and correctional goals." *Id.* (citing *Young v. Jones*, 37 F.3d 1457, 1459–60 (11th Cir. 1994)). "[I]n light of the substantial deference to be accorded to prison officials in prison administration, [the Eleventh Circuit is] hesitant to require strict compliance with the 'advance' in the advance notice requirement." *Bass*, 170 F.3d at 1319 (internal citation omitted).

In his Complaint, Plaintiff alleges that he never received a disciplinary report or notice of a rule violation; no hearing was held[10]; Lieutenant Sewell did not call Defendants Mayes and Bethea or inmate Combs to be witnesses; and Lieutenant Sewell told Plaintiff that "[Defendant] Crow told [Lieutenant Sewell] to find [Plaintiff] guilty" and Lieutenant Sewell "was just falling [sic] orders." Doc. 1 at 13. In response, Defendants provide evidence that, on October 11, 2018, Marcus Duncan personally served a copy of the Disciplinary Report on Plaintiff and informed him of his rights to present a statement at the hearing and written questions for witnesses. Doc. 35-1 at 24. The Disciplinary Report provides that Plaintiff was charged with a violation of "Rule 903—Assault with a weapon on a Person(s) associated with ADOC" for cutting Defendants Mayes and Bethea with a razor. *Id*. The Report indicates that Plaintiff refused to sign the Report and refused to indicate if he desired witnesses. *Id*.

---

[10] However, Plaintiff acknowledges elsewhere that, "[o]n October 16th, 2018, [Lieutenant Sewell] came to Kilby . . . to hold [his] Disciplinary Hearing." Doc. 1 at 13. He further acknowledges that he was present when Lieutenant Sewell rendered a verdict of guilty; he simply appears to believe it was not a "fair hearing" because no witnesses were called forth to testify. *See id*.

Defendants further evince that Plaintiff's hearing was held on October 16, 2018 at 12:30 in the Kilby Seg Commander's Office. *Id*. at 25. The Hearing Officer was Lieutenant Sewell, who made the following findings:

> After further investigation, it was discovered that [Plaintiff] cut [Defendants Mayes and Bethea] with a razor. The Hearing Officer questioned [Defendants] concerning the incident. [Defendant Mayes] positively identified [Plaintiff] as the inmate who assaulted him. Lt. Sewell questioned inmate Combs, who also identified [Plaintiff] as the inmate who cut [Defendants].

*Id*. at 26. Officer Sewell further affirmed that Plaintiff was given written notice of his charges at least 24 hours prior to the hearing, able to attend the hearing, permitted to call at least three witnesses, and permitted to prepare questions for the witnesses. *Id*. at 27. Finally, Officer Sewell affirmed that he found Plaintiff guilty based on the written statement of inmate Combs and the verbal statement of Lieutenant Totty, both of which advised that Plaintiff assaulted Defendants Mayes and Bethea; that Lieutenant Totty attended the hearing telephonically; and that Plaintiff did not ask for any witnesses during the hearing. Doc. 35-6. Defendants rely on the initial Disciplinary Report indicating Plaintiff's refusal to sign, the final Disciplinary Report setting forth the details of the October 16 hearing, and their own sworn statements.

In his responses to Defendants' filings, Plaintiff does not refute Defendants' evidence. Specifically, he does not dispute the authenticity of either the initial or final Disciplinary Report, both of which provide that he had advance written notice of the charges against him, a written statement of the reasons for the disciplinary action taken, and the opportunity to call witnesses and present evidence, nor does he maintain his

assertions from the Complaint that he did not receive advance notice of his charges and that Lieutenant Sewell did not rely on Defendants Mayes and Bethea or inmate Combs as witnesses.[11] Moreover, Plaintiff wholly fails to refute Defendants' evidence that Plaintiff refused to sign the Disciplinary Report when it was presented to him, which invalidates his initial assertion that he was not provided a copy of the Report.

Thus, the only record evidence supporting a deprivation of due process claim are Plaintiff's unsupported—and, as noted above, sometimes contradicting—assertions from the Complaint. The undersigned finds these statements—absent further factual detail or evidentiary support and in light of Plaintiff's lack of response to the Disciplinary Reports— insufficient to defeat summary judgment. *See Walker*, 911 F.2d at 1577 ("A mere 'scintilla' of evidence supporting the opposing party's position will not suffice; there must be enough of a showing that the jury could reasonably find for that party."); *Waller v. Comm'r of Soc. Sec.*, 168 F. App'x 919, 922 (11th Cir. 2006) (finding assertion in plaintiff's affidavit that conflicted with other, more substantial evidence constituted "[a] mere scintilla of evidence . . . insufficient to defeat a motion for summary judgment"); *Sherwood v. United Parcel Serv., Co., Inc.*, No. 5:22-CV-499, 2023 WL 5807011, at *6 (N.D. Ala. Sept. 7, 2023) ("[Plaintiff's] deposition testimony alone constitutes a 'mere scintilla' of evidence and is insufficient, in view of the unrebutted, objective evidence of record, to support a denial of summary judgment."); *Demps v. Hillsborough Cnty. Clerk of the Ct.*, No. 8:18-CV-742, 2019 WL 5080486, at *3 (M.D. Fla. Oct. 10, 2019) ("Plaintiff's single allegation in her

---

[11] To the contrary, Plaintiff appears to acknowledge that Lieutenant Sewell relied on at least inmate Combs' statement, as he later argues that inmate Combs' statement was coerced by individuals other than Lieutenant Sewell.

affidavit constitutes a 'mere scintilla' of evidence [that] is insufficient to defeat summary judgment.") (citation omitted).

Accordingly, Defendants Crow and Thomas are entitled to summary judgment on Plaintiff's Fourteenth Amendment deprivation of due process claim.

### e.   Plaintiff has failed to establish a genuine issue of material fact as to an Eighth Amendment conditions of confinement claim against Defendant Thomas.

To prevail on an Eighth Amendment conditions of confinement claim, a prisoner must show that his conditions are objectively "serious" or "extreme" enough to constitute a denial of the "minimal civilized measure of life's necessities." *Thomas v. Bryant*, 614 F.3d 1288, 1304 (11th Cir. 2010). In certain circumstances, a denial of outside recreation for an extended period of time may support an Eighth Amendment claim. *Compare Antonelli v. Sheahan*, 81 F.3d 1422, 1432 (7th Cir. 1996) (inmate confined in cell for seven weeks without out-of-cell recreation had a viable Eighth Amendment claim because he did not have sufficient room for any type of recreation within his cell) *with Thomas v. Ramos*, 130 F.3d 754, 764 (7th Cir. 1997) (finding no constitutional violation where inmate confined in his cell for seventy days was "able to engage in exercise in his cell such as push-ups, sit-ups, jogging in place, and step-ups").

However, in the Eleventh Circuit, "complete denial . . . of outdoor exercise, although harsh, [does] not violate the Eighth Amendment when accompanied by penological justification." *Stallworth v. Wilkins*, 802 F. App'x 435, 444 (11th Cir. 2020) (internal quotations and citation omitted). Moreover, "even 'total deprivation of outdoor exercise as a part of 'continuous solitary confinement' does not qualify as wanton where prisoners'

health is closely monitored and they are allowed to exercise in their cells." *Anthony v. Warden*, 823 F. App'x 703, 708 (11th Cir. 2020) (quoting *Bass*, 170 F.3d at 1320).

Plaintiff alleges that, following his disciplinary hearing, he was placed on outside restriction for 60 days, during which he was not "allowed to come out and exercise." Doc. 25-1 at 5. However, the record establishes that Plaintiff's temporary denial of outdoor exercise was accompanied by penological justification as contemplated in *Stallworth* and *Bass*. Although Plaintiff disputes that he in fact cut Defendants Mayes and Bethea with a razor, it is undisputed that they did in fact suffer multiple stab wounds during their altercation with Plaintiff and, although there were inconsistencies in the evidence as to whether Plaintiff was responsible for those wounds, there was sufficient evidence to support Officer Sewell's determination of guilt—indeed, at the time of the hearing, Defendant Mayes, Defendant Bethea, inmate Combs, and Lieutenant Totty all identified Plaintiff as the inmate who cut Defendants.[12] *See Stallworth*, 802 F. App'x at 444 (finding it was "clear the officers had penological justification to withhold outdoor recreation from [plaintiff] and other inmates accused of rioting" despite plaintiff's assertion that he was falsely accused of participating in the riot).

Moreover, even if the decision did lack penological justification, Plaintiff has nevertheless failed to establish an Eighth Amendment violation. In *Christmas v. Nabors*, 76 F. 4th 1320 (11th Cir. 2023), the Eleventh Circuit noted that, in order to succeed on an Eighth Amendment claim for deprivation of outdoor recreation, a plaintiff must satisfy

---

[12] Inmate Combs did not allege that he was coerced into making that statement until November 2018, approximately a month after the Disciplinary Hearing. *See* Doc. 1 at 14.

both objective *and* subjective elements. *Id*. at 1331–32. As to the subjective element, a plaintiff must demonstrate that the defendant acted with deliberate indifference to a substantial risk of serious harm. *Id*. at 1332 (citing *Bass*, 170 F.3d at 1317). The Court stated:

> [Plaintiff] argues only that Lieutenant Nabors denied him access to outdoor recreation without "any legitimate reason." For our purposes at the § 1915A stage, we can assume without deciding that [plaintiff] is right—that is, we can assume that Lieutenant Nabors denied him access to outdoor recreation without any legitimate reason.[]
>
> But even if that's so, that satisfies only the objective inquiry. And [plaintiff's] briefs altogether ignore the subjective prong, which, again, requires a showing that the prison official who imposed the challenged condition had a "sufficiently culpable state of mind."[] Nor can we address that prong for him; "the law is by now well settled in this Circuit that a legal . . . argument that has not been briefed before the court is deemed abandoned and its merits will not be addressed."

*Id*. at 1332 (internal citations omitted).

Here, like in *Christmas*, Plaintiff proffers no evidence that his temporary deprivation of outdoor recreation placed him at substantial risk of serious harm, much less harm of which Defendant Thomas was aware.[13] He proffers no evidence that his health went unmonitored during the 60-day period or that he was not permitted to exercise in his cell. *See Anthony*, 823 F. App'x at 708; *see also Saunders v. Sheriff of Brevard Cnty.*, 735 F. App'x 559, 566 (11th Cir. 2018) (finding plaintiff failed to state an Eighth Amendment

---

[13] Plaintiff alleges only that he "suffered physical pain and emotional distress[] from Warden Thomas depriving him of coming out of his cell for 60 days." Doc. 1 at 14. However, this single allegation is far too vague and conclusory to create an issue of material fact at the summary judgment stage. *See Ellis*, 432 F.3d at 1326; *see also Owens v. Sec'y of Fla. Dep't of Corr.*, 812 F. App'x 861, 870 (11th Cir. 2020) (citing *Leigh v. Warner Bros.*, 212 F.3d 1210, 1217 (11th Cir. 2000) ("[The Eleventh Circuit] has consistently held that conclusory allegations without specific supporting facts have no probative value."))

violation based on lack of outdoor recreation because plaintiff "never alleged that the officers in fact denied him the ability to exercise"). Accordingly, absent such a showing, Defendant Thomas is entitled to summary judgment on Plaintiff's Eighth Amendment conditions of confinement claim.

## V.    CONCLUSION

Accordingly, based on the foregoing, the undersigned RECOMMENDS that:

1.     Defendant Wexford Health Sources, Inc.'s Special Report (Doc. 23), which the Court construes as a motion for summary judgment, be GRANTED; Judgment be GRANTED in favor of Defendant Wexford Health Sources, Inc.; and Defendant Wexford Health Sources, Inc. be DISMISSED as a party to this action.

2.     Defendant Crow, Thomas, Mayes, and Bethea's first Special Report (Doc. 24), which the Court construes as a motion for summary judgment, be GRANTED and judgment be GRANTED in favor of Defendants Crow, Thomas, Mayes, and Bethea as to Plaintiff's Eighth Amendment delay of medical care claims.

3.     Defendant Crow, Thomas, Mayes, and Bethea's second Special Report (Doc. 35), which the Court construes as a motion for summary judgment, be GRANTED in part and DENIED in part; Judgment be GRANTED in favor of Defendant Thomas; and Defendant Thomas be DISMISSED as a party to this action.

4.     Judgment be GRANTED to Defendant Crow on Plaintiff's Fourteenth Amendment deprivation of due process claim; Judgment be DENIED to Defendant Crow on Plaintiff's Eighth Amendment failure to protect claim; and judgment be DENIED to Defendants Mayes and Bethea on Plaintiff's Eighth Amendment excessive force claim.

5.     This case proceed on (a) Plaintiff's Eighth Amendment failure to protect claim against Defendant Crow; and (b) Plaintiff's Eighth Amendment excessive force claim against Defendants Mayes and Bethea.

It is further ORDERED that, on or before **February 28, 2024**, the parties may file objections to this Recommendation. The parties must specifically identify the factual findings and legal conclusions in the Recommendation to which objection is made. Frivolous, conclusive, or general objections will not be considered. The parties are advised that this Recommendation is not a final order and, therefore, is not appealable.

Failure to file written objections to the Magistrate Judge's findings and recommendations in accordance with 28 U.S.C. § 636(b)(1) will bar a party from a de novo determination by the District Court of legal and factual issues covered in the Recommendation and waive the right of the party to challenge on appeal the District Court's order based on unobjected-to factual and legal conclusions accepted or adopted by the District Court except on grounds of plain error or manifest injustice. *Nettles v. Wainwright*, 677 F.2d 404 (5th Cir. 1982); 11th Cir. R. 3-1. *See Stein v. Reynolds Sec., Inc.*, 667 F.2d 33 (11th Cir. 1982); *see also Bonner v. City of Prichard, Ala.*, 661 F.2d 1206 (11th Cir. 1981) (en banc).

DONE this 14th day of February, 2024.


/s/ Charles S. Coody
CHARLES S. COODY
UNITED STATES MAGISTRATE JUDGE